United States District Court
Southern District of Texas
**ENTERED**
September 22, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MICHAEL MCCANN, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:20-CV-139 |
| | § | |
| TANYA LAWSON, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION**
**TO DISMISS CERTAIN CLAIMS AND TO RETAIN CASE**

Plaintiff Michael McCann is a Texas inmate appearing *pro se* and *in forma pauperis*. He filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff's case is subject to screening pursuant to the Prison Litigation Reform Act. *See* 42 U.S.C. § 1997e(c); 28 U.S.C. §§1915(e)(2), 1915A. For purposes of screening, Plaintiff has stated: (1) Eighth Amendment claims of deliberate indifference against Dr. **Isaac Kwarteng and J. Chapa** in their individual capacities; and (2) an Eighth Amendment claim for injunctive relief against **Dr. Lannette Linthicum, Dr. Owen Murray, and Dr. Brian O'Donnell** in their official capacities as the party or parties able to provide the injunctive relief should Plaintiff prevail. The undersigned will order service on these defendants.

The undersigned further recommends for the reasons set forth below that: (1) Plaintiff's claims for money damages against all Defendants in their official capacities be

**DISMISSED** as barred by the Eleventh Amendment; (2) the John or Jane Doe Defendant be **DISMISSED** from this action; (3) Plaintiff's claims against the remaining defendants be **DISMISSED** for failure to state a claim and/or as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1); and (4) Plaintiff's Motion for Preliminary Injunction (D.E. 11) be **DENIED**.

## I.     JURISDICTION

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This case has been referred to the undersigned magistrate judge for case management and making recommendations on dispositive motions pursuant to 28 U.S.C. § 636.

## II.     PROCEDURAL BACKGROUND AND PLAINTIFF'S ALLEGATIONS

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID) and is currently housed at the Jester 3 Unit in Richmond, Texas.  Plaintiff's allegations in this case arise in connection with his previous housing assignment to the McConnell Unit in Beeville, Texas.

Plaintiff sues the following McConnell Unit officials in their individual and official capacities: (1) Tonya Lawson, Practice Manager; (2) J. Chapa, Registered Nurse (RN); (3) Dr. Isaac Kwarteng; (4) Samuel Gregory, Nurse; and (5) Jane or John Doe. (D.E. 1).  Plaintiff alleges that Defendants acted with deliberate indifference to his serious medical needs by failing to treat his serious toe injury and by transferring Plaintiff to the Jester Unit in retaliation for Plaintiff filing grievances against them.  Plaintiff seeks monetary relief as well as injunctive relief in the form of being returned to the McConnell Unit as well as proper medical treatment for his toe injury.

Plaintiff has filed a Motion for Preliminary Injunction.  (D.E. 11, p. 4).  On June 30, 2020, the undersigned ordered the Office of the Attorney General (OAG) to submit a response to Plaintiff's Motion for Preliminary Injunction and a *Martinez*[1] report to assist the Court in evaluating whether a preliminary injunction is warranted.  (D.E. 13).  The OAG subsequently has filed both its *Martinez* report and its response to the Motion for Preliminary Injunction.  (D.E. 24, 26).

On June 30, 2020, the undersigned conducted a *Spears*[2] hearing.  The following representations were made either in Plaintiff's original complaint (D.E. 1) or at the *Spears* hearing. Plaintiff is 55 years old and has a chronic diabetes condition. Plaintiff is currently housed at the Jester 3 Unit, which is a medical facility.  According to Plaintiff, however, "[t]he medical department here is exactly the same as McConnell."  (D.E. 17, pp. 3-4).

While being housed at the McConnell Unit, Plaintiff cut his toe in his cell on a sharp screw in July or August of 2019.  Plaintiff was unaware of the dangerous condition and stubbed his toe on the screw accidently.  (D.E. 17, p. 7).   Plaintiff's describes the laceration cut as serious as he sliced his toe from the top a quarter inch down to the bottom.

---

[1] *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *Cay v. Estelle*, 789 F.2d 318, 323 n. 4 (5th Cir. 1986). *See also Cay v. Estelle*, 789 F.2d 318, 323 n. 4 (5th Cir.1986) (Fifth Circuit approved of the use of *Martinez* Reports in order to develop the factual basis of inmate claims).

[2] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

Plaintiff alleges RN Chapa initially told security after the incident happened that Plaintiff should not initially come down to medical and should wait until 5:00 p.m., which was the appointment time for insulin.  As Plaintiff sat in his cell, his cubicle was covered in blood.  Plaintiff claims RN Chapa ultimately refused to see Plaintiff despite the extensive bleeding.  (D.E. 17, p. 8).

On the second day after the incident, Plaintiff was seen by Dr. Kwarteng, who provided Plaintiff with a seven-day supply of antibiotics.  Plaintiff did not receive any supplies for cleaning his wound.  No follow-up appointment was scheduled.  Plaintiff's toe wound festered for several months, and he submitted four I-60 complaints between September and December 2020.  Meanwhile, Plaintiff was told that it was normal for his wound to be leaking blood.

Plaintiff has been prescribed a drug for nerve pain associated with his diabetic condition.  Plaintiff alleges he sought a renewal of his nerve pain drug, but he was denied the medication for pain relief.  (D.E. 17, p. 9).  By that time, Plaintiff was suffering from unbearable pain because his toenail and toe had completely turned and faced the floor.  (D.E. 17, pp. 9-10).  Plaintiff alleges he continues to have to file informal and formal grievances to get his prescription renewed and other relief for his toe.

On February 9, 2020, while receiving insulin, Plaintiff requested that his toe be examined.  Plaintiff alleges RN Chapa informed Plaintiff that no walk-ins were permitted, even though it was plainly evident that Plaintiff's foot was oozing blood and had a staph infection.  Plaintiff's toe was deformed and three times the normal size.

At some point, medical officials provided Plaintiff with 42 days of Vancomycin for his infected toe.  Plaintiff claims this medication was administered improperly in Plaintiff's arms or wrists and not through a PICC line,[3] which had been promised to Plaintiff by McConnell Unit officials.   (D.E. 17, p. 11).   According to Plaintiff, Vancomycin should not be administered in the wrist area or else it will "fry" the veins and kidneys.  Rather, Vancomycin must be administered through a PICC line.  Medical officials stopped giving Plaintiff his Vancomycin because of the substandard delivery method.  Plaintiff's treatment ended on June 20, 2020.  Plaintiff disputes any contention from medical officials that he refused treatment with Vancomycin.

Plaintiff explains that the leaking from his toe has stopped, but his bone infection remains and is spreading.  Plaintiff was informed that medical officials want to "chop off the toe" in October 2020.  (D.E. 17, p. 10).  Because his wounded toe now looks like his big toe, Plaintiff believes he needs to have the toe immediately removed before the infection spreads.  Plaintiff was told that this remedy was not available as the Hospital Galveston was not accepting anybody due to problems related to Covid-19.

Plaintiff testified that he was transferred to the Jester 3 Unit after filing grievances against RN Chapa, Practice Manager Lawson, and Dr. Kwarteng.  (D.E. 17, p. 12).  Plaintiff claims these defendants along with Nurse Gregory worked together to get Plaintiff transferred from the McConnell Unit to a unit where they knew Covid-19 was spreading.   While housed at the Jester 3 Unit, Plaintiff contracted Covid-19 in May 2020

---

[3] "A PICC line is a peripherally inserted catheter which is a central venous catheter inserted into a vein in the arm rather than a vein in the neck or chest" and "is used to give[] medicines into a vein near the skin."  *Jones v. Spencer*, No. 16-1745, 2016 WL 6574162, at *1 (E.D. La. Oct. 5, 2016).

but has now recovered with respect to that infection. Plaintiff alleges however, he has been denied treatment on his toe for over a month. Plaintiff prefers the McConnell Unit over the Jester 3 Unit because the McConnell Unit has respite showers and recreation.

Plaintiff sues Practice Manager Lawson based on her role in denying his I-60 complaints for proper medical treatment and causing Plaintiff to be transferred to the Jester 3 Unit. According to Plaintiff, Practice Manager Lawson falsely signed off on informal grievances that the amputation of his toe would not affect his health and stated that Plaintiff's foot condition was not an urgent need. Plaintiff further claims she falsified paperwork to ensure a retaliatory transfer of Plaintiff to a more dangerous unit. Plaintiff claims RN Chapa failed to provide Plaintiff with proper treatment for his toe when it was obviously needed and for lying on the medical documentation that Plaintiff had refused treatment with Vancomycin.

Plaintiff sues Dr. Kwarteng based on allegations that he: (1) failed to provide timely and adequate treatment for Plaintiff's toe wound; (2) refused to x-ray his toe; (3) failed to inform Plaintiff that his condition was not an urgent need; and (4) informed Plaintiff that he had wrongly diagnosed Plaintiff's condition as a soft tissue problem. Plaintiff further alleges Dr. Kwarteng lied when documenting that Plaintiff had refused to take Vancomycin. Lastly, Dr. Kwarteng allegedly participated in having Plaintiff transferred to the Jester 3 Unit which is a Covid-13 hot spot.

Plaintiff sues Nurse Gregory because he directed his subordinate nurses to administer the Vancomycin in Plaintiff's wrist. Plaintiff claims Nurse Gregory administered the Vancomycin properly in Plaintiff's elbow as Plaintiff preferred on one

or two occasions.  Nurse Gregory informed Dr. Kwarteng that Plaintiff needed to be transferred because Plaintiff was non-compliant and giving Nurse Gregory a hard time about taking Vancomycin.  Plaintiff testified that Nurse Gregory's involvement was not as serious as the other three named defendants and indicated a willingness to dismiss Nurse Gregory from the lawsuit.  (D.E. 17, pp. 26-27).  Plaintiff also sues a John or Jane Doe on the basis that he does not know everyone was involved with the falsification of records and retaliatory transfer.[4]

In both his Motion for Preliminary Injunction and testimony at the *Spears* hearing, Plaintiff identified three additional TDCJ officials as potentially having the ability to provide his requested injunctive relief.  These individuals are Dr. Linthicum, Dr. Murray from the UTMB-CMC, and Dr. O'Donnell who is Medical Director of TDCJ's Region IV.  (D.E. 11, p. 1; D.E. 17, pp. 27-28).  Plaintiff believes that these individuals are responsible for Plaintiff's "medical move" and are, therefore, capable of providing Plaintiff with the injunctive relief requested.

## III.   *Martinez* Report

The OAG has submitted a *Martinez* report consisting of: (1) Exh. 1 - Plaintiff's medical records (D.E. 20-1); and (2) Exh. 2 - Affidavit of Dr. Glenda Adams along with relevant medical records  (D.E. 20-2).  The medical records submitted by the OAG total well over 1000 pages.

---

[4] Because Plaintiff fails to identify a John or Jane Doe Defendant, the undersigned respectfully recommends that this unidentified defendant be dismissed at this time.  Should further factual development of this case reveal that it is appropriate to add another prison official, Plaintiff may seek to amend the complaint.

The records attached to the OAG's response reveal that Plaintiff has several chronic medical conditions, including obesity, arthritis of the right knee, hypertension, hyperlipidemia, Type 2 diabetes mellitus requiring insulin therapy, and peripheral neuropathy associated with his diabetic condition.  (D.E. 20-2, p. 4).  In her affidavit, Dr. Adams summarized as follows the treatment Plaintiff has received for his toe wound from the time of his injury on August 18, 2019 until May 1, 2020:

- August 18, 2019 – After TDCJ notified the medical department that Plaintiff would be sent as a walk-in, he was seen several hours by the nursing staff with regard to an injury described as "an avulsion injury to his right foot fifth digit."   After consulting with Dr. Kwarteng, topical antibiotic ointment (TAO) and a band aid was applied to the wound.

- August 19, 2019 – Dr. Kwarteng saw Plaintiff and instructed him to apply the TAO to his toe wound and secure the wound with a band aid and tape daily for ten days.  Dr. Kwarteng ordered medical passes for Plaintiff for 60 days of shower shoes and 14 days of band aids, tape, and TAO for 14 days.

- August 28, 2019 – Plaintiff was issued additional TAO and band aids.  After Plaintiff informed the medical staff that his wound had not improved, he was given a pass to return to the clinic the next day when a medical provider was on site.

- October 2, 2019 through February 11, 2020 – Plaintiff was seen at the medical department on a daily basis for finger stick blood sugar testing.  During this time, Plaintiff complained about and received treatment for other medical issues.

- February 12, 2020 – Plaintiff complained of a draining foot wound.  His right fifth toe was noted by the nursing staff as having thick, dry, scaly skin with yellow drainage.  Plaintiff refused a gauze bandage.  Physician Assistant (PA) Echavarry ordered antibiotic amoxycillin for ten days and

directed Plaintiff to return to the medical department the next day to be seen by a medical provider.

● February 13, 2020 – PA Echavarry noted that Plaintiff's fifth right toe was red, swollen, and having a foul smelling drainage. PA Echavarry ordered cultures of the wound and prescribes another antibiotic for ten days. PA Echavarry submitted a referral for Plaintiff to see a would care specialist and ordered the nursing staff to clean the wound and dress with a large band aid.

● Dr. Kwarteng instructed the nursing staff to provide daily would care to Plaintiff's toe for thirty days.

● February 15, 2020 through March 2, 2020 – Plaintiff received daily wound care as well as another antibiotic. There was significant drainage on February 16, 2020, and Plaintiff was given intermuscular injections of Ancef for ten days. Plaintiff responded well to the Ancef treatment. PA Echavarry reported that Plaintiff's infection is sensitive to Vancomycin and Linezolid. Plaintiff reported on February 28, 2020 that his toe was starting to look bad again. He received additional Ancef treatments.

● March 3, 2020 – Dr. Kwarteng saw Plaintiff and noted that Plaintiff's toe abscess was improving. He ordered the Ancef injections to continue for 5 more days as well as daily cleansings and wound dressings.

● March 3, 2020 through March 15, 2020 – Antibiotic injections and daily wound care continued. Plaintiff failed to show for an Ancef injection on March 9, 2020. Plaintiff's Ancef compliance rate was only 46.67%.

● March 24, 2020 – Dr. Kwarteng saw Plaintiff and ordered new laboratory testing for Plaintiff's toe, a right foot x-ray, and an increase to Plaintiff's wound care to twice daily. Dr. Kwarteng also ordered Vancomycin to be administered intravenously twice daily for 21 days.

● March 25, 2020 – Plaintiff refused his evening dose of Vancomycin after the nursing staff was unable to establish IV access.

● March 26, 2020 - Dr. Kwarteng sought approval for Plaintiff to receive a PICC line placement and possible infirmary placement. Plaintiff was approved by the UTMB/CMC Utilization Review (UR) for transfer to a local hospital for PICC line placement. Plaintiff refused to go, stating that he did not want his movements to be restricted in an infirmary.

● March 27, 2020 – Dr. Kwarteng saw Plaintiff after Plaintiff has refused Vancomycin administration for two evenings in a row due to complaints about vascular access. Dr. Kwarteng explained to Plaintiff that the Vancomycin would be discontinued until a PICC line could be placed due to serious consequences of not being able to consistently administer the antibiotic. Dr. Kwarteng ordered the twice daily wound care to continue.

● March 28, 2020 through March 30, 2020 – The x-ray report revealed "diabetic calcifications, soft tissue swelling, and possible osteomyelitis (bone infection)[5] involving the right fifth toe phalanges (small toe bones) and possibly the fourth and fifth metatarsal heads."

● March 31, 2020 – the UR approved Plaintiff to be transferred to the local hospital's emergency room for evaluation and PICC line insertion. Despite Dr. Kwarteng's counsel on the importance of this treatment, Plaintiff refused to go to the hospital, refused a PICC line, and refused to sign a Refusal of Treatment form.

● April 3- 2020 – Plaintiff was seen via telemedicine by would care specialist Dr. Cynthia Ho. Dr. Ho agreed with Dr. Kwarteng's recommendation for a PICC line and made the following recommendations: (1) referral to infectious disease specialist; (2) avoid non-steroidal anti-inflammatory drugs such as Motrin and Ibuprofen; (3) referral to vascular lab for certain studies; (4) referral to podiatry; (5) provide with special shoes; and (6) transfer to Type 3 single level facility with restrictions to walking less than 50 yards.

---

[5] "Ostemyelitis is an '[i]nflammation of the marrow and hard bone tissue of bone, usually caused by a bacterial infection.'" *Rodriguez v. University of Texas Tech Health Science Center*, No. 6:15cv532, 2017 WL 6811801, at *4 (E.D. Tex. Nov. 22, 2017) (quoting BLAKISTON'S GOULD MEDICAL DICTIONARY 964 (4th ed. 1979)).

● April 4, 2020 through April 28, 2020 – Plaintiff's attendance for daily wound care was variable with multiple no-shows. Plaintiff was issued his medical shoes on April 7, 2020, but he refused to wear them. During this time period, Plaintiff's toe wound appeared to improve.

(D.E. 20-2, pp. 5-13).

Due to a request by Dr. Ho for Plaintiff to be housed at a Type 3 single level facility, Plaintiff was transferred to the Jester 3 Unit on May 1, 2020, so there would be no need for Plaintiff to walk more than 50 yards. (D.E. 20-2, pp. 3, 13, 48). Dr. Adams summarized as follows the treatment Plaintiff has received at the Jester 3 Unit:

● May 5, 2020 – After seeing Plaintiff, Dr. Edgar Hulipas and Nurse Practitioner Martha Beck noted that Plaintiff was noncompliant with medical treatments, that no beds at the Hospital Galveston were available, and that Plaintiff refused treatment at an outside hospital for his toe infection. New cultures of the toe wound were collected, and Plaintiff was started on Vancomycin for 21 days.

● May 5, 2020 through May 26, 2020 – Plaintiff's compliance with the Vancomycin treatment was 61.9%. Plaintiff did not show for his appointment with Dr. Ho due to the Jester 3 Unit being placed on lockdown.

● May 27, 2020 – Dr. Hulipas ordered 21 additional days of Vancomycin treatment.

● June 9, 2020 – A second x-ray of Plaintiff's fifth right toe showed "progressive osseous erosive changes" and continued osteomyelitis.

● June 10, 2020 – Plaintiff was seen by Dr. Ho. He reported to Dr. Ho that his right toe was healed. Dr. Ho submitted a referral for an expedited MRI of Plaintiff's fifth right toe as well as a referral for Plaintiff to be evaluated at the Brace and Limb Clinic for special medical shoes.

● June 14, 2020 – Plaintiff received his last dose of Vancomycin. Plaintiff's compliance rate with the latest round of Vancomycin treatment was 44.74%. Throughout his treatment, Plaintiff's Vancomycin trough levels remained consistently below levels recommended to treat osteomyelitis and frequently below levels necessary to prevent resistance.

● July 16, 2020 – Plaintiff refused his MRI. His referral to the Brace and Limb Clinic remained pending.

## IV.   LEGAL STANDARDS

When a prisoner seeks to proceed *in forma pauperis* the Court shall evaluate the complaint and dismiss it without service of process if the Court finds the complaint frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. *See* 28 U.S.C. § 1915(e)(2)(B) (providing that a court shall review an *in forma pauperis* complaint as soon as practicable and dismiss it if it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from an immune defendant). A claim is frivolous if it has no arguable basis in law or fact. *Neitzke v. Williams,* 490 U.S. 319 (1989). A claim has no arguable basis in law if it is based on an indisputably meritless legal theory, "such as if the complaint alleges the violation of a legal interest which clearly does not exist." *Davis v. Scott,* 157 F.3d 1003, 1005 (5th Cir. 1998). A claim has no arguable basis in fact if "after providing the plaintiff the opportunity to present additional facts when necessary, the facts alleged are clearly baseless." *Talib v. Gilley,* 138 F.3d 211, 213 (5th Cir. 1998).

"In analyzing the complaint, [the Court] will accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir. 1999). "The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim. Thus, the Court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Id.* (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff must allege sufficient facts in support of its legal conclusions that give rise to a reasonable inference that Defendant is liable. *Id*.; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The factual allegations must raise Plaintiff's claim for relief above the level of mere speculation. *Twombly*, 550 U.S. at 555. As long as the complaint, taken as a whole, gives rise to a plausible inference of actionable conduct, Plaintiff's claim should not be dismissed. *Id*.

A *Martinez* report is "a tool" to be used to further develop the factual basis of an *in forma pauperis* or prisoner complaint in order to determine whether *sua sponte* dismissal is appropriate. *Wiley v. Thompson*, 234 F. App'x 180, 182 (5th Cir. 2007) (per curiam). For instance, "[a] court may base a dismissal under [§ 1915A or] … § 1915(e) on medical or other prison records if they are adequately identified and authenticated, such as those included in a *Martinez* report, and medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs." *Ruiz v. Mercado*, No. M-14-921, 2016 WL

1166040, at *2 (S.D. Tex. Feb. 10, 2016) (internal quotations and citation omitted). However, information provided through "[a] *Martinez* report may not be used to resolve material disputed fact findings when they are in conflict with the pleadings or affidavits." *Newby v. Quarterman*, 325 F. App'x 345, 354 (5th Cir. 2009) (per curiam) (citing *Shabazz v. Askins*, 980 F.2d 1333, 1334-35 (10th Cir. 1992)).

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004). To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988). A defendant acts under color of state law if he misuses or abuses official power and if there is a nexus between the victim, the improper conduct, and the defendant's performance of official duties. *Townsend v. Moya,* 291 F.3d 859, 861 (5th Cir. 2002).

## V.   DISCUSSION

### A.   Eleventh Amendment Immunity and Official Capacity

A suit against a state officer in his or her official capacity is effectively a suit against that state official's office. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). The Eleventh Amendment, however, bars claims for money damages against a state or state agency. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Aguilar v. Texas Dep't of Criminal Justice,* 160 F.3d 1052, 1054 (5th Cir. 1998). As such, an action for monetary damages against a state official in his or her official capacity is one against the state itself, and is barred by the Eleventh Amendment. *See Kentucky v.*

*Graham*, 473 U.S. 159, 166 (1985).   The Fifth Circuit has extended the Eleventh Amendment immunity specifically to TDCJ officers and officials acting in their official capacities.  *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002) (Eleventh Amendment bars prisoner's suit for money damages against prison officials in their official capacities).

To the extent that Plaintiff sues the individual Defendants in their official capacities for money damages, those claims are barred by the Eleventh Amendment. Thus, it is respectfully recommended that Plaintiff's claims for money damages against the individual Defendants in their official capacities be dismissed as barred by the Eleventh Amendment.

### B.   Deliberate Indifference

To state a § 1983 claim for denial of adequate medical treatment, a prisoner must allege the official acted with deliberate indifference to the prisoner's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).  Deliberate indifference requires that prison officials both be aware of specific facts from which the inference could be drawn that a serious medical need exists and then the prison official, perceiving the risk, must deliberately fail to act. *Farmer*, 511 U.S. at 837.

In the context of medical treatment, the prisoner must show "that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal

quotation marks and citation omitted).  Delay in treatment may be actionable under §
1983 only if there has been deliberate indifference and the delay results in substantial
harm.  *Stewart v. Murphy,* 174 F.3d 530, 537 (5th Cir.1999); *Mendoza v. Lynaugh,* 989
F.2d 191, 195 (5th Cir. 1993).

"Deliberate indifference is an "extremely high standard to meet."  *Domino v.
Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  "[U]nsuccessful
medical treatment and acts of negligence or medical malpractice do not constitute
deliberate indifference, nor does a prisoner's disagreement with [his] medical treatment,
absent exceptional circumstances."  *Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir.
2012).

### *(1)  Dr. Kwarteng*

Plaintiff alleges that Dr. Kwarteng: (1) failed to provide timely and adequate
treatment for Plaintiff's toe wound; (2) failed to inform Plaintiff that his condition was an
urgent need; (3) refused to medicate with Vancomycin and later lied when documenting
that Plaintiff had refused to take Vancomycin; and (4) refused to x-ray Plaintiff's toe.
Plaintiff alleges that Dr. Kwarteng treated Plaintiff on the second day after he suffered his
foot injury and provided Plaintiff with a seven-day supply of antibiotics.  According to
Plaintiff, he did not receive any supplies for cleaning his wound, no follow-up
appointment was scheduled, and his toe wound festered for several months.

As part of the *Martinez* report, Dr. Adams details the medical treatment provided
by Dr. Kwarteng from August 19, 2019 until April 2020.  While providing Plaintiff with
TAO, bandages, and tape, the medical records provided by the OAG do not reflect that

Dr. Kwarteng prescribed any antibiotics specifically targeting his toe wound during the remaining months of 2019.  Indeed, these records reflect that Plaintiff did not receive such antibiotic treatment for his foot wound until February 12, 2010, when PA Echavarry ordered a ten-day supply of the antibiotic amoxicillin.  (D.E. 20-2, p. 8).  Dr. Kwarteng also did not order an x-ray on Plaintiff's foot until March 24, 2020.

The objective medical records reflect that Plaintiff's toe wound has received extensive medical attention and treatment throughout 2020, including antibiotic therapy, x-rays, and wound care.  Given the apparent severity of Plaintiff's toe wound, Plaintiff's allegations, accepted as true, suggest that Dr. Kwarteng may have acted with deliberate indifference to Plaintiff's serious medical needs by failing to ascertain the seriousness of Plaintiff's injury when it happened and ordering necessary antibiotic treatment in a prompt manner.  Accordingly, the undersigned recommends that Plaintiff's deliberate indifference claims against Dr. Kwarteng be retained against him in his individual capacity.

### (2)  RN Chapa

Plaintiff alleges that RN Chapa: (1) delayed and ultimately refused to see Plaintiff on the day he suffered his toe injury leaving Plaintiff to bleed in his cell; and (2) failed to permit Plaintiff to walk-in to medical on February 9, 2020, even though it was plainly evident that Plaintiff's toe was oozing blood and was three times the normal size as well as infected.  The *Martinez* report fails to disclose any information regarding whether RN Chapa saw or treated Plaintiff on either the day of the injury or February 9, 2020.  Rather, the objective medical records reflect that, on the day he suffered his injury, Plaintiff was

scheduled to be examined in the medical clinic as a walk-in and was seen several hours later.  There is no medical documentation presented to show that Plaintiff was in the medical clinic on February 9, 2020.

Plaintiff's allegations, accepted as true, suggest that RN Chapa may have acted with the requisite deliberate indifference to Plaintiff's serious toe wound on both the day of the injury and February 9, 2020.  Accordingly, the undersigned respectfully recommends that Plaintiff's deliberate claims against RN Chapa be retained against him in his individual capacity.

### (3)  *Practice Manager Lawson*

Plaintiff alleges that Practice Manager Lawson: (1) denied his I-60 complaints for proper medical treatment; and (2) falsely signed off on informal grievances that the amputation of his toes would not affect his health and stated that Plaintiff's foot condition was not an urgent need.  Dr. Adams states in her affidavit that Practice Manager Lawson is not a medical practitioner and that her statements and opinions have no impact on the medical care provided to Plaintiff.

Plaintiff's allegations, accepted as true, indicate that Practice Manager Lawson became aware of Plaintiff's complaints regarding inadequate medical care through Plaintiff's filings of informal and formal grievances.  Practice Manager Lawson, however, was not personally involved in the decisions made by the prison's medical personnel in treating Plaintiff for his foot condition.  *See Thompson v. Steele,* 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action.").

Plaintiff's allegations, at best, point to his dissatisfaction with Practice Manager Lawson's failure to provide him with any relief in connection with his formal and informal grievances.  Such allegations, however, fail to state a cognizable constitutional claim.  *See Geiger v. Jowers,* 404 F.3d 371, 374 (5th Cir. 2005) (prisoners do not have a federally protected liberty interest in having grievances investigated, let alone resolved in their favor).  Accordingly, the undersigned respectfully recommends that Plaintiff's deliberate indifference claims against Practice Manager Lawson be dismissed with prejudice as frivolous and/or for failure to state a claim for relief.

### (4)  Nurse Gregory

Plaintiff alleges that Nurse Gregory: (1) directed his subordinate nurses to administer the Vancomycin in Plaintiff's wrist; (2) on one or two occasions, Nurse Gregory proceeded to administer the Vancomycin properly in Plaintiff's elbow as Plaintiff preferred; and (3) gave Plaintiff a hard time about taking Vancomycin and informed Dr. Kwarteng that Plaintiff was non-compliant.  The medical records submitted by the OAG do not show that Nurse Gregory ever denied Plaintiff treatment.

At the *Spears* hearing, Plaintiff testified that Nurse Gregory's involvement was not as serious as the other three named defendants and indicated a willingness to dismiss Nurse Gregory from the lawsuit.  (D.E. 17, pp. 26-27).   Plaintiff's allegations, accepted as true, fail to suggest that Nurse Gregory deliberately withheld Vancomycin from Plaintiff or otherwise denied or delayed treatment for Plaintiff.   Accordingly, the undersigned respectfully recommends that Plaintiff's deliberate indifference claims

against Nurse Gregory be dismissed with prejudice as frivolous and/or for failure to state a claim for relief.

### (5)  *Defendants Linthicum, O'Donnell, and Murray*

Plaintiff alleges that Defendants Linthicum, Murray, and O'Donnell each are capable of providing Plaintiff with the injunctive relief requested.  Dr. Adams states in her affidavit that none of these defendants provide direct patient care to TDCJ inmates and that Defendants Murray and O'Donnell have no responsibility with  regard to housing or unit assignments.

For purposes of obtaining injunctive relief, it is unclear whether any of the three officials identified by Plaintiff are able to fashion the relief Plaintiff is seeking.  Further factual development will aid the Court in determining whether any one of these defendants or another prison official is capable of providing Plaintiff with the injunctive relief requested.  Accordingly, the undersigned respectfully recommends that Plaintiff's deliberate indifference claims be retained against Defendants Linthicum, Murray, and O'Donnell in their official capacities for injunctive relief only.[6]

### C.    Retaliation

Retaliation is not expressly referred to in the Constitution; however, it is nonetheless actionable because retaliatory actions may tend to chill an individual's exercise of constitutional rights.  *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

---

[6] A prisoner's transfer from a prison unit renders moot his claims of deliberate indifference to his serious medical needs when seeking injunctive relief against the defendants at that unit.  *Sias v. Jacobs*, No. 6:17cv413, 2017 WL 8229544, at *4 (E.D. Tex. Dec. 11, 2017); *King v. TDCJ*, No 3:15-CV-1365, 2016 WL 8671926, at *2 (N.D. Tex. Jan. 8, 2016). Because Plaintiff has been transferred from the McConnell Unit, his claims for injunctive relief against Defendants Kwarteng and Chapa should be dismissed with prejudice.

Retaliation is actionable "only if the retaliatory act 'is capable of deterring a person of ordinary firmness from further exercising his constitutional rights.'" *Bibbs v. Early*, 541 F.3d 267, 270 (5th Cir. 2008) (quoting *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006)).

The purpose of allowing retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising their constitutional rights. *Morris*, 449 F.3d at 686. Thus, "[a] prison official may not retaliate against or harass an inmate for exercising the right of access to the courts, or for complaining to a supervisor about a guard's misconduct." *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995). "Filing grievances and otherwise complaining about the conduct of correctional officers through proper channels are constitutionally protected activities, and prison officials may not retaliate against inmates for engaging in such protected inmates." *Reese v. Skinner*, 322 F. App'x 381, 383 (5th Cir. 2009) (citing *Morris*, 449 F.3d at 684).

The Fifth Circuit has emphasized that "prisoners' claims of retaliation are regarded with skepticism and are carefully scrutinized by the courts." *Adeleke v. Fleckenstein*, 385 F. App'x 386, 387 (5th Cir. 2010) (citing *Woods*, 60 F.3d at 1166). In addition, the Fifth Circuit has concluded that some acts, even though they may be motivated by retaliatory intent, are so *de minimis* that they would not deter the ordinary person from further exercise of his rights. *Morris*, 449 F.3d at 686. Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim. *Id.* For example, a job transfer from the commissary to the kitchen might be *de minimis*,

while a transfer to a more dangerous unit might constitute an adverse retaliatory act.  *Id.* at 687.

To state a valid § 1983 claim for retaliation, "a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation."  *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999) (citing *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998)).  An inmate must allege more than his personal belief that he is the victim of retaliation.  *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997) (citation omitted).  Mere conclusory allegations of retaliation will not withstand a summary judgment challenge.  *Woods*, 60 F.3d at 1166.  The inmate must produce direct evidence of motivation or a chronology of events from which retaliation may be inferred.  *Id.*  A successful claim of retaliation requires a showing that, but for some retaliatory motive, the complained of adverse incident would not have occurred.  *Id.*

Plaintiff claims that Defendants Kwarteng, Chapa, Lawson, and Gregory transferred him to another prison in  retaliation for Plaintiff's filing of grievances against him in which he complained about his medical care.  Plaintiff alleges that: (1) Nurse Gregory informed Dr. Kwarteng that Plaintiff needed to be transferred because Plaintiff was non-compliant with medications; and (2) Defendants Kwarteng, Chapa, Lawson, and Gregory lied and falsified documentation to get Plaintiff transferred from the McConnell Unit to a unit where they knew Covid-19 was spreading.

 Plaintiff primarily relies on his personal belief that he was subjected to a retaliatory transfer and not on specific facts setting forth a coherent chronological series

of events where retaliation can be inferred.  He offers no specific facts to support his conclusory assertions that his medical documentation was falsified to ensure a retaliatory transfer.  At best, Plaintiff's allegations suggest a temporal proximity between the time Plaintiff filed his grievances and Plaintiff's transfer to the Jester 3 Unit.  Such temporal proximity alone, however, is insufficient to state "but for" causation in a retaliation claim. *Reese*, 322 F. App'x at 383.

Plaintiff's allegations, accepted as true, further fail to suggest that the transfer to the Jester 3 Unit constitutes an adverse action.  Plaintiff alleges that the Jester 3 Unit is a medical facility and that the Jester 3 Unit's medical department is exactly the same as the McConnell Unit.  He further offers no allegations to suggest that the Jester 3 Unit is more dangerous or otherwise worse than the McConnell Unit.  In her affidavit submitted as part of the *Martinez* report, Dr. Adams stated that Plaintiff was transferred to the Jester 3 Unit due to Dr. Ho's recommendation that Plaintiff be housed at a Type 3 single level facility.  (D.E. 20-2, p. 3).  Rather than constitute an adverse action carried out to punish Plaintiff, Plaintiff's transfer to a single-level medical facility was ordered to benefit Plaintiff.  *See Black v. Graham*, No. 2:16-cv-207, 2019 WL 1573793, at *2-3 (N.D. Tex. Mar. 4, 2019).

Accordingly, it is respectfully recommended that Plaintiff's retaliation claims against Defendants Kwarteng, Chapa, Lawson, and Gregory be dismissed as frivolous and/or for failure to state a claim for relief.

**D.      Motion for Preliminary Injunction**

Plaintiff has filed a Motion for Preliminary Injunction, contending that he has not received proper medical care for his serious toe wound.  (D.E. 11).   To obtain a preliminary injunction under Federal Rule of Civil Procedure 65(a), the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) the injunction will not disserve the public interest.  *Texans for Free Enterprise v. Texas Ethics Com'n*, 732 F.3d 535, 536-37 (5th Cir. 2013).  Injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance. *Sepulvado v. Jindal,* 729 F.3d 413, 417 (5th Cir. 2013) (internal citations and quotations omitted).   Plaintiff must carry the burden as to all four elements before a preliminary injunction may be considered.  *Voting for America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (internal quotations and citations omitted).

Plaintiff asks the Court to direct Defendants to (1) transfer him back to the McConnell Unit; and (2) provide Plaintiff with medical treatment, which includes the proper administration of Vancomycin for his bone infection and immediate amputation of his infected toe to prevent spread of the bone infection. (D.E. 11, p. 4).  In its response, the OAG contends that Plaintiff cannot satisfy any of the elements necessary to demonstrate an entitlement to preliminary injunctive relief.  (D.E. 28, pp. 11-16).

### (1)   Likelihood of Success on the Merits

Plaintiff first must demonstrate a likelihood of success on the merits of his lawsuit in order to obtain preliminary injunctive relief.   *Sepulvado*, 729 F.3d at 417.    The undersigned has set forth above the governing law regarding deliberate indifference and retaliation claims.   In her affidavit, Dr. Adams details the extensive medical treatment provided by Dr. Kwarteng, RN Chapa, and other medical officials in connection with Plaintiff's toe wound.   The objective medical evidence presented in connection with the *Martinez* report shows that Plaintiff: (1) has received antibiotic treatment such as Vancomycin on numerous occasions for his toe wound; and (2) Plaintiff has refused various treatments and recommendation for his toe condition on a number of occasions as well.

Plaintiff's Eighth Amendment claims may essentially boil down to his disagreement with the course of his treatment for his serious toe wound.   Such disagreement, however, is generally not actionable under the Eighth Amendment.   *See Sama*, 669 F.3d at 590.   *See also Whiting v. Kelly*, 255 F. App'x 896, 899 (5th Cir. 2007) ("Although [plaintiffs] clearly believe that they should undergo additional testing and drug therapies, such disagreement does not give rise to a constitutional claim.") (citations omitted).   While Plaintiff has alleged facts sufficient to state deliberate indifference claims against some of the name Defendants, he has failed to show at this time a substantial likelihood that he will prevail on any of these claims.

Furthermore, as discussed above, Plaintiff has failed to allege facts sufficient to state a retaliation claim based on his transfer to the Jester 3 Unit, which is a single level

medical facility.  Plaintiff, therefore, has failed to establish at this time a substantial likelihood of success on the merits of either his deliberate indifference or retaliation claims.

### (2)  Irreparable Harm

Second, in order to obtain preliminary injunctive relief, Plaintiff must show he will suffer irreparable harm if the injunction is denied.  *Sepulvado*, 729 F.3d at 417.  Plaintiff indicates in his Motion for Preliminary Injunction that, if he is not given the proper treatment with Vancomycin and amputation of his toe, his bone infection will spread and lead to the amputation of his leg.  (D.E. 11, p. 4).  Plaintiff recently filed a notice with the Court indicating that he had been advised on March 24, 2020 by Dr. Kwarteng that amputation of the toe was the only cure.  (D.E. 31, p. 2).

A review of the objective medical records does not reflect that Dr. Kwarteng or any other official made a recommendation on August 24, 2020 to amputate Plaintiff's fifth right toe.  (D.E. 20-17, pp. 11-29).  Rather, the records on this day show that Dr. Kwarteng ordered new laboratory testing for Plaintiff's toe, a right foot x-ray, an increase to Plaintiff's wound care to twice daily; and Vancomycin to be administered intravenously twice daily for 21 days.  (D.E. 20-2, p. 9; D.E. 20-17, pp 18-19).  Lastly, the objective records reflect that Plaintiff was last seen by wound care specialist Dr. Ho, who requested a referral for an expedited MRI of Plaintiff's fifth right toe and referred Plaintiff to the Brace and Limb Clinic for special medical shoes.  (D.E. 20-2, p. 14). There is nothing in the medical documentation to indicate any urgency regarding whether to amputate the toe.

No medical determination or diagnosis had been made in these records to suggest an imminent threat of Plaintiff's bone infection spreading to his leg such that it would be in danger of amputation.  The medical records submitted in the *Martinez* report show that Plaintiff has received on-going and extensive medical care for his toe wound both before and after his transfer to the Jester 3 Unit.  Thus, Plaintiff fails to demonstrate a substantial threat that he will suffer irreparable injury if the injunction is denied.

### (3)   Remaining Elements

Under the third and fourth elements, Plaintiff must demonstrate that the threatened injury outweighs any damage that the injunction might cause the defendant and that the injunction will not disserve the public interest.   *Sepulvado*, 729 F.3d at 417.  Plaintiff's allegations of potential and speculative harm do not amount to a constitutional violation, and in the absence of such a violation, federal courts are reluctant to interfere in the internal affairs of a state prison. *See Richie v. UTMB Hospital Galveston*, No. 2:12-CV-322, 2012 WL 12871940, at *2 (S.D. Tex. Oct. 18, 2012) (citing *Kahey v. Jones*, 836 F.2d 948, 950 (5th Cir. 1988)).  Court interference with Plaintiff's medical treatment would not be in the public's interest at this early stage in the proceedings. *See Richie*, 2012 WL 12871940, at *2.  Accordingly, Plaintiff has failed to demonstrate either the third or fourth elements of the preliminary injunctive standard.

## VI.   RECOMMENDATION

For the reasons stated above and for purposes of § 1915A, it is respectfully recommended that the following claims be **RETAINED**: (1) Plaintiff's Eighth Amendment claims of deliberate indifference against **Dr. Isaac Kwarteng and J. Chapa**

in their individual capacities; and (2) an Eighth Amendment claims for injunctive relief against **Dr. Lannette Linthicum, Dr. Owen Murray, and Dr. Brian O'Donnell** in their official capacities as the party or parties able to provide the injunctive relief should Plaintiff prevail.  The undersigned will order service as to these defendants by separate order.

It is respectfully recommended further that: (1) Plaintiff's claims for money damages against all Defendants in their official capacities be **DISMISSED** as barred by the Eleventh Amendment; (2) the John or Jane Doe Defendant be **DISMISSED** from this action; (3) Plaintiff's claims against the remaining defendants be **DISMISSED** for failure to state a claim and/or as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1); and (4) Plaintiff's Motion for Preliminary Injunction (D.E. 11) be **DENIED**.

ORDERED this 22nd day of September 2020.

Jason B. Libby
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).